**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| RUSSELL PHILLIPS, KELLI D. CHOATE, and STEVEN WITTE, individually and as representatives of a Class of Participants and Beneficiaries of The Elanco US, Inc. 401(k) Plan,<br><br>Plaintiffs,<br><br>v.<br><br>ELANCO US, INC., BOARD OF DIRECTORS OF ELANCO US, INC., THE ELANCO US EMPLOYEE BENEFITS COMMITTEE; SHEPHERD FINANCIAL INVESTMENT ADVISORY, LLC,<br><br>Defendants. | Case No. 25-2159 |

## CLASS ACTION COMPLAINT

Plaintiffs Russell Phillips, Kelli D. Choate, and Steven Witte ("Plaintiffs"), individually and as representatives of a Class of Participants and Beneficiaries of The Elanco US, Inc. 401(k) Plan, by and through their counsel, WALCHESKE & LUZI, LLC, as and for a claim against Defendants, allege and assert to the best of their knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

## INTRODUCTION

1. Plaintiffs, individually and on behalf of the Class, allege Defendants Elanco US, Inc. ("Elanco"), the Board of Directors of Elanco US, Inc. ("Board), and The Elanco US, Inc. Employee Benefits Committee ("Plan Committee") (collectively "Defendants"), breached their fiduciary duties of prudence and monitoring under the Employee Retirement Income Security Act ("ERISA"), 29 U.SC. § 1132, regarding The Elanco US, Inc. 401(k) Plan (the "Plan" or "Elanco Plan").

2. This case arises from investment losses incurred by the Elanco U.S., which was established on January 1, 2019, and which is governed under ERISA.

3. The Plan allows participants to direct the investment of their contributions but limits the investment options to those selected by the Plan's fiduciaries.

4. The Plan is a Section 401(k) "defined contribution" pension plan under 29 U.S.C. § 1002(34), meaning that the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l,* 575 U.S. 523, 525 (2015).

5. When Plan participants do not instruct how they want their money invested in the Plan, their retirement assets are placed into a qualified default investment alternative ("QDIA") which, until recently, was the American Century Target Date Funds Trust IX ("American Century TDFs").

6. The duty to monitor such Plan investments is especially important where a high percentage of the Elanco Plan's assets were concentrated in the American Century TDFs as the Plan's QDIA.

7. During a large part of the Class Period (2020 to 2023), between 66% and 73% of the Plan's assets, involving a large percentage of the Plan's over 3700 participants, were invested in the American Century TDFs:

| Year Ending | Elanco Plan Assets in American Century TDFs | Total Elanco Plan Assets | Percentage of Elanco Plan Asset in American Century TDFs |
|---|---|---|---|
| 12/31/2020 | $426,565,252 | $584,685,533 | 73% |
| 12/31/2021 | $451,315,720 | $647,836,581 | 70% |
| 12/31/2022 | $366,493,570 | $534,272,647 | 69% |
| 12/31/2023 | $406,300,006 | $619,575,070 | 66% |

8. TDFs are actively managed funds that target specific dates of retirement by gradually shifting allocations of stocks, bonds, and cash overtime to more conservative

investments as the retirement target date approaches.

9. All target date funds are inherently actively managed because managers make changes to the allocations to stocks, bonds, and cash over time. These allocation shifts are referred to as a fund's "glide path."

10. Typically, there will be multiple TDFs for the different expected retirement dates of the employees of a given organization, such as the 2030 Fund, the 2040 Fund, and the 2050 Fund. Collectively these TDFs are sometimes referred to as a "series." TDFs are primarily designed for participants who want a dynamic but consistently and appropriately diversified asset allocation that changes over time as the participants approach their expected retirement date, and are designed to be a "set it and forget it" investment option for participants who want their investments to be appropriately balanced and managed until they expect to retire.

11. The specific target date portfolio for a participant who fails to make an investment election, and therefore is invested in the Plan QDIA, will be based on the participant's date of birth and an assumed normal retirement date of age 65.

12. Plaintiffs and other Class Members are participants and beneficiaries of the Elanco Plan, under ERISA Section 3(7), 29 U.S.C. § 1002(7), who invested in the American Century TDFs.

13. Shepherd Financial Investment Advisory, LLC ("Shepherd") is the Plan's investment consultant and advisor.

14. The Class is defined as: "All participants and beneficiaries of The Elanco US, Inc. 401(k) Plan who invested in any of the American Century Target Date Funds (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) during the Class Period."

15. Defendant Plan Committee breached its fiduciary duties to Plaintiffs and the Class when they engaged in the following imprudent fiduciary processes:

(a) uncritically relied on the Plan investment advisor and consultant, Shepherd, who unreasonably and imprudently favored American Century TDFs to be Plan investments and qualified default investment alternatives ("QDIAs")

from the beginning of the Class Period until August 17, 2025;

(b) failed to follow the Plan's investment policy statement ("IPS") and Plan Committee practice which required Plan funds scoring less than 65 to be placed on a Watch List;

(c) failed to undertake timely TDF or QDIA suitability analyses with regard to the American Century TDFs during the Class Period; and

(d) waited too long to replace the American Century TDFs given that knew of its consistent underperformance, high investment turnover rate, and loss of TDF market share, during the entire Class Period.

16. The decision to maintain the American Century TDFs was an objectively imprudent investment decision based on the information that the Plan Committee had at the beginning of the Class Period on October 21, 2019, since the Plan Committee knew at that time of the American Century TDFs' consistently underperformed compared to both their peer group and relevant benchmarks, as well as know of their alarming turnover rate and loss of market share during the Class Period.

17. These alleged procedural and substantive breaches involving the American Century TDF imprudent investments resulted in the loss of tens of millions of dollars for Plaintiffs and the Class.

18. To remedy these fiduciary breaches, Plaintiffs bring this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) in a representative capacity to enforce Defendants' liability under 29 U.S.C. § 1109(a), and to make good to the Plan all losses resulting from these breaches. In addition, Plaintiffs seek to reform the Plan to comply with ERISA and to prevent further breaches of fiduciary duties and grant other equitable and remedial relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq*.

20. This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

21. Venue is appropriate in this District within the meaning of 29 U.S.C. § 1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within the District.

## THE PARTIES AND THE PLAN

22. The Elanco Plan is a defined contribution employee pension benefit plan under 29 U.S.C. § 1002(2)(A) and § 1002(34).

23. Plaintiff Russell Phillips is a resident of the State of Utah and, and during the Class Period, was a participant in the Plan under 29 U.S.C. § 1002(7). Plaintiff Phillips was employed by Elanco starting in January 1, 2015, and ending January 1, 2020. During that time he held several positions, including Territory Manager and Senior Territory Manager, in Salt Lake City, UT.

24. Plaintiff Phillips held the following investments in the Plan, among others: American Century Retirement 2040 Trust Class IX. He rolled out of the Plan on December 11, 2024.

25. Plaintiff Kelli D. Choate is a resident of the State of Arizona and, and during the Class Period, was a participant in the Plan under 29 U.S.C. § 1002(7). Plaintiff Choate was employed by Elanco, and its predecessor, starting in October 2012 and ending in August 2021.

During that time she held several positions, including Associate Consultant-IT Analyst, in Overland Park, KS and Lenexa, KS.

26. Plaintiff Choate held the following investments in the Plan, among others: American Century Retirement 2035 Trust Class IX. She rolled out of the Plan in October 2021.

27. Plaintiff Steven Witte is a resident of the State of Kansas and, and during the Class Period, was a participant in the Plan under 29 U.S.C. § 1002(7). Plaintiff Witte was employed by Elanco starting on April 20, 2015, and ending on July 16, 2021. During that time he held several positions, including Research Scientist and Team Leader, in Greenfield, IN.

28. Plaintiff Witte held the following investments in the Plan, among others: American Century Retirement 2035 Trust Class IX. He rolled out of the Plan in December 2021.

29. Plaintiffs have Article III standing to bring this action on behalf of the Plan because they suffered actual injuries to their Plan accounts in which they held a number of the American Century TDFs during the Class Period, those injuries are fairly traceable to Defendants' unlawful conduct as fiduciaries of the Plan in retaining the American Century TDFs in the Plan, and the harm is likely to be redressed by a favorable judgment.

30. In all, Plaintiffs were invested in various American Century TDFs (American Century Retirement 2035 Trust Class IX and American Century Retirement 2040 Trust Class IX), during the Class Period, and thus, suffered an injury-in-fact to their individual retirement accounts in the Elanco Plan.

31. Having established Article III standing, Plaintiffs may seek recovery under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), on behalf of the Plan to obtain relief for the Plan under ERISA § 409(a), 29 U.S.C. § 1109(a), including relief that sweeps beyond their own injuries.

32. The named Plaintiffs and all participants in the Plan did not have knowledge of all material facts (including, among other things, regarding the imprudence selection, and maintenance of, the American Century TDFs) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

33. The named Plaintiffs and all participants in the Plan, having never managed a large 401(k) Plan such as the Elanco Plan, lacked actual knowledge of prudent Plan investments or the prudent alternative investments available to the Plan. Further, Plaintiffs did not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan (including Defendants' processes for maintaining and monitoring the Plan's investments) because this information is solely within the possession of Defendants prior to discovery.

34. Elanco is a global animal health company that develops and markets products and services for companion and food animals. The company, headquartered as of October 2025, in Indianapolis, Indiana, became an independent, publicly traded company in 2018 after separating from Eli Lilly and Company. Its principal headquarters are located at 450 Elanco Circle, Indianapolis, IN 46221. In this Complaint, "Elanco" refers to the named Defendants and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

35. Elanco is the Plan sponsor under 29 U.S.C. § 1002(16)(B).

36. Elanco acted through its officers, including the Board Defendants, to perform Plan-related fiduciary functions in the course and scope of their business. Under the Plan, the company, through its Board, is responsible for appointing the Plan Committee, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, the Elanco and its Board are fiduciaries of the Plan within the meaning of 29 U.S.C. § 1002(21)(A).

37. The Plan Committee is the Plan Administrator of the Elanco Plan.

38. As the Plan Administrator, the Plan Committee is a fiduciary with day-to-day Plan and operating control of the Plan under 29 U.S.C. § 1002(21)(A). It has authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a).

39. The Plan Committee is also a named fiduciary of the Plan, and has exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to properly carry out such responsibilities.

40. Shepherd Financial Investment Advisory LLC ("Shepherd") is a plan investment consultant and advisor that has expertise in consulting on retirement plans, and always signs on as either an ERISA 3(21) or 3(38) fiduciary for every client. Its principal headquarters are located at 111 Congressional Blvd Suite 100, Carmel, IN 46032.

41. According to the April 1, 2022 Elanco Plan Investment Policy Statement ("IPS"), which is the most recent Plan IPS, "[t]he Committee has engaged Shepherd Financial Investment Advisory, LLC ('the Investment Adviser') as a nondiscretionary investment adviser to the Plan. The Investment Adviser is responsible for the following services related to the Plan assets as described in the investment advisory agreement, including, but limited to, the following: . . . Assisting the Committee in monitoring the investment options by preparing periodic investment reports based on conformance to the guidelines set forth in this IPS and making recommendations to retain or remove and or replace investment options." *See* Investment Policy Statement, The Elanco US, Inc. 401(k) Plan, prepared on April 1, 2022, and adopted on September 19, 2023 ("April 2022 IPS").

42. Although Shepherd was named not as the Plan's fiduciary in the Elanco Plan's governing document, "[a] party not specifically named as a fiduciary of a plan owes a fiduciary duty only 'to the extent' that party (i) exercises any discretionary authority or control over management of the plan or its assets; (ii) offers 'investment advice for a fee' to plan members; or (iii) has 'discretionary authority' over plan 'administration." 29 U.S.C. § 1002(21)(A)).

43. Shepherd is a Plan fiduciary under ERISA § 3(21)(A)(ii), 29 U.S.C. § 1002(21)(A)(ii), to the extent that it provides investment advice to the Elanco Plan for a fee.

**<u>FACTUAL ALLEGATIONS</u>**

**<u>IMPRUDENT INVESTMENTS UNDER ERISA</u>**

44. Under ERISA, plan fiduciaries must discharge their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

45. ERISA's fiduciary duties have been described as "the highest known to the law." *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan by & through Lyon v. Buth*, 99 F.4th 928, 943 (7th Cir. 2024).

46. "In determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Tibble*, 575 U.S. at 528–29. The Supreme Court has stated that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones ... separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Id.* at 529. "If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 742 (2002) (citing *Tibble*, 575 U.S. at 529–30).

47. To state a breach of the duty of prudence under ERISA, a plaintiff must plead "(1) that the defendant is a plan fiduciary; (2) that the defendant breached its fiduciary duty; and (3) that the breach resulted in harm to the plaintiff." *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016).

48. As discussed above, all Defendants are plan fiduciaries and the alleged breaches resulted in loss of tens of millions of dollars to Plaintiff and the Class.

49. As far as whether Defendants' breached their fiduciary duties of prudence, a fiduciary's duty of prudence is both procedural and objective. *Fish v. GreatBanc Tr. Co.,* 749 F.3d 671, 680 (7th Cir. 2014).

50. That is, "[i]n reviewing the acts of fiduciaries under the objective prudent person standard, courts examine both the process used by the fiduciaries to reach their decision as well as an evaluation of the merits." *Id.*

51. Under Seventh Circuit law, ERISA plaintiffs may demonstrate a fiduciary breach either through direct allegations of a flawed fiduciary process or through meaningful benchmarks showing that no prudent fiduciary would retain the challenged investment.

52. During the Class Period, Defendants breached the duty of prudence they owed to the Plan by failing to monitor the American Century TDFs and by not removing these TDFs at

the beginning of the Class Period based on information available at that time to both the Plan Committee and Shepherd with regard to the suitability and prudence of the American Century TDFs.

53. These direct procedural defects include at least the four specific procedural defects discussed above with regard to the fiduciary process followed by the Plan Committee and Shepherd fiduciaries in maintaining the American Century TDFs as plan investments and as QDIAs through August 17, 2025.

54. In addition to being able to provide the necessary plausible allegations through direct evidence of procedural defects, plaintiffs can also indirectly show that "a prudent fiduciary in like circumstances" would have selected a different TDF suite of funds based on the cost or performance of the selected fund, through a sound basis for comparison — a meaningful benchmark, such as a peer group TDF or TDF market index, to show that a prudent fiduciary in like circumstances would have selected a different fund.

55. The Defendants' selection and continued retention of the American Century TDFs are the result of objectively imprudent investment decisions which ignored: (1) consistent and historical underperformance in comparison to its own benchmark and other comparable TDFs in its peer group that was available to the Plan Committee at the beginning of the Class Period; (2) substantial turnover in American Century TDF's underlying investment indicating a lack of investment discipline; and (3) a significant loss in TDF market share during the relevant period.

56. As discussed in detail below, under the objective prudent person standard, and considering both the substantive reasonableness of the Plan Committee actions and the prudence by which the Plan Committee made its decision, the Committee, as fiduciaries, breached its fiduciary duty of prudence under ERISA by selecting and retaining the American Century TDFs in the Elanco Plan for most of the Class Period, causing tens of millions of dollars of investment losses to Plaintiffs and other Class Members during the Class Period.

57. In other words, the Plan Committee is liable based on procedural imprudence in how they selected and retained the American Century TDFs, as well as based on that fact that the

American Century TDF investments in the Elanco Plan represented objectively imprudent investment decision starting at the beginning of the Class Period, and continuing through their replacement by the T. Rowe Price Blended TDF Trusts ("TRP TDFs") on August 18, 2025.

## IMPRUDENT FIDUCIARY PROCESS

58. The Elanco Plan has an investment policy statement ("IPS") that sets out investment management procedures.

59. The most recent Elanco IPS, the April 2022 IPS, establishes the policies and guidelines for the Elanco Plan and was intended to assist the Plan Committee and its investment advisor, Shepherd, in effectively selecting, monitoring, and evaluating investment alternatives made available to participants under the Plan. *Id.* at 2-5.

60. The Elanco April 2022 IPS states that the Plan Committee, "as fiduciaries under the Plan, [have] the primary responsibilities of: . . . [s]elect[ing] the asset classes, and select, retain, monitor, and remove or replace, where appropriate, the investment options offered under the Plan." *Id.* at 3.

61. With regard to Shepherd, the Elanco April 2022 states that "[t]he Committee has engaged Shepherd Financial Investment Advisory LLC ("the Investment Advisor")" to "assist[ ] the Committee in monitoring the investment options by preparing periodic investment reports based on conformance to the guidelines set forth in the IPS and making recommendations to retain or remove and or place investment options." *Id.*

62. On its website, Shepherd states that, "[t]o show our commitment, the Shepherd Financial team always signs on as either a 3(21) or 3(38) fiduciary for every client." Here, Shepherd acted a 3(21) fiduciary to the Elanco Plan by providing investment advice to the Elanco Plan for a fee.

63. When a Plan participant does not give instructions on how they want to invest their retirement money in the Elanco Plan, their retirement monies are placed into a QDIA. April 2022 IPS at 3.

64. The Plan Committee may elect to utilize a multi-asset class investment option, such as TDFs, as the QDIA. *Id.*

65. The April 2022 IPS has statements maintaining that the IPS contains guidelines only and that fiduciaries are not required to follow them. *Id.* at 2.

66. Yet, the April 2022 IPS states that "[t]he particular investment under consideration should meet the following standards for selection, as well as the investment criteria set forth in Appendix A." *Id.* at 4.

67. Those standards for selection include considering "[i]nvestment performance *[which] should be competitive with median return for an appropriate, style-specific benchmark and peer group*," and "[s]pecific risk and risk-adjusted return measures should be reviewed by the Committee and be within a reasonable range relative to appropriate, style-specific benchmark and peer group." *Id.* (emphasis added),

68. With regard to Investment Criteria to be considered, Appendix A lists the following seventeen criteria: (1) Total Return – 3 Year; (2) Total Return – 5 Year; (3) Alpha – 3 Year; (4) Alpha – 5 Year; (5) Beta – 3 Year; (6) Beta – 5 Year; (7) Treynor Ratio – 3 Year; (8) Treynor Ratio – 5 Year; (9) Sortino Ratio – 3 Year; (10) Sortino Ratio – 5 Year; (11) Manager Tenure; (12) Net Expense Ratio; (13) Style Drift; (14) Up-Market Capture – 3 Year; (15) Up-Market Capture – 5 Year; (16) Down-Market Capture – 3 Year; and (17) Down-Market Capture – 5 Year.

69. Appendix A then provides: "Passing Score: 65. Investment options will be evaluated on these 17 investment criteria and are awarded points for passing each standard. Points awarded are aggregated to determine whether a fund is classified as 'Pass' or 'Watch.'"

70. Based on the IPS, it is not known for how long Watch List investment options will be monitored and remain on the Watch List before being subject to evaluation and potential replacement.

71. Appendix A also states with regard to "Target Date/Target Risk Funds ("Asset Allocation Funds") that "[t]he scoring for Asset Allocation Funds diverges from traditional asset

classes . . . due to factor considerations unique to Asset Allocation Funds. Without restriction, investment managers freely design and express investment philosophies that differ significantly in crucial areas such as asset class diversification, equity exposure, portfolio construction, and glide path end date." April 2022 1PS, Appx. A.

72. Nevertheless, outside of these subjective criteria, Appendix A still provides objective investment criteria for Target Date Funds (excluding Style Drift) and provides different weighing factors and standards: (1) Total Return – 3 Year (In Highest 50% of Peer Group – 5%); (2) Total Return – 5 Year (In Highest 50% of Peer Group – 9%); (3) Alpha – 3 Year (In Highest 50% of Peer Group – 6%); (4) Alpha – 5 Year (In Highest 50% of Peer Group – 10%); (5) Beta – 3 Year (In Lowest 50% of Peer Group – 2%); (6) Beta – 5 Year (In Lowest 50% of Peer Group – 4%); (7) Treynor Ratio – 3 Year (In Highest 50% of Peer Group – 4%); (8) Treynor Ratio – 5 Year (In Highest 50% of Peer Group – 8%); (9) Sortino Ratio – 3 Year (In Highest 50% of Peer Group – 6%); (10) Sortino Ratio – 5 Year (In Highest 50% of Peer Group – 8%); (11) Manager Tenure (Greater Than or Equal to 2 Years – 8%); (12) Net Expense Ratio (In Lowest 50% of Peer Group – 6%); (13) Up-Market Capture – 3 Year (In Highest 50% of Peer Group – 2%); (15) Up-Market Capture – 5 Year (In Highest 50% of Peer Group – 4%); (16) Down-Market Capture – 3 Year (In Lowest 50% of Peer Group – 4%); and (17) Down-Market Capture – 5 Year (In Lowest 50% of Peer Group – 6%).

73. The April 2022 IPS does not define "Peer Group" in its Glossary.

74. The April 2022 IPS also states that "monitoring performance relative to specified guidelines is part of the overall monitoring process," and that, "[m]onitoring should be regularly and follow the same criteria used for the initial selection of investments. *It is contemplated . . . that a formal review will be done at least annually*." *Id.* (emphasis added).

75. One of the considerations under the investment monitoring and reporting section is that each investment option shall be reviewed with consideration of the following: "Significant loss or growth of assets under management." *Id.*

76. The April 2022 IPS continues: "Based upon all of these factors, the Committee, with the assistance of the Investment Advisor, shall identify those investment options that need to be placed on a Watch List." *Id.* at 5.

77. The American Century TDFs had been included as investment options in the Elanco Plan from January 1, 2019 to August 17, 2025, before being replaced by the TRP TDFs on August 18, 2025 (which was also the TRP TDFs inception date).

78. Although none of Plan's TDF options are benchmarked to a specific market index or to a specific group of TDFs in the IPS, because American Century TDFs are "to" TDFs, as far as glide path end date, and are actively managed as far as investment philosophy, the most appropriate market index for purposes of comparison is the S&P Target Date "To" Index.

79. As far as the appropriate "peer group" for comparison purposes, the most appropriate comparator group is made up of fifteen (15) TDF series which are in the TDF Collective Investment Trust universe in Morningstar and have a "To Retirement" Glide Path for each vintage: (1) Alta with State St Cus Tg Dt Ser; (2) American Century RD Hybrid; (3) American Century Ret Readiness; (4) BlackRock LifePath Dynamic; (5) BlackRock LifePath Index; (6) Cabana Target Date SS and Lin Fin; (7) ClimateSmart Retirement; (8) JPMCB SmartRetirement; (9) JPMCB SmartRetirement PASV Bld; (10) MyWayRetirement Index; (11) PIMCO RealPath Bld; (12) Putnam Retirement Advantage; (13) Russell Inv 2035 Strategy Fund; (14) SmartGoal by J.P. Morgan; and (15) Transamerica LifeGoalSM.

80. Morningstar categories are more reliable than simply comparing fund prospectuses, because Morningstar is a third party providing neutral information. Indeed, "Morningstar categories help investors and investment professionals make meaningful comparisons between funds." *See* https://sg.morningstar.com/sg/news/115635/morningstar-category-definition.aspx

81. There was no shortage of prudent choices. Beginning in 1994, the market for target date funds exploded with numerous investment managers offering a variety of different target date funds (both mutual funds and collective trusts alike).

82. By 2010, multiple investment firms and banks offered target date funds with established and consistent performance histories, stable and experienced management, and discrete changes to the underlying assets and allocations.

83. Although some of these comparator TDFs are index funds, this fact establishes that better performance was possible with cheaper index funds, as well as with non-index TDFs, all with similar "to" glide end paths.

84. The following charts show how different vintages of the American Century TDFs in the Elanco Plan fared on annualized and cumulative bases against "S&P Target Date To" Index:

**Annualized Calculations:**

| American Century TDF | American Century Annualized Performance 1/1/2019 to 12/31/2024 | "S&P Target Date To" Annualized Performance 1/1/2019 to 12/31/2024 | American Century Annualized Underperformance 1/1/2019 to 12/31/2014 |
|---|---|---|---|
| American Century One Choice 2030 IX | 7.78% | 8.07% | (0.29%) |
| American Century One Choice 2035 IX | 8.38% | 9.19% | (0.81%) |
| American Century One Choice 2040 IX | 9.01% | 10.06% | (1.05%) |
| American Century One Choice 2045 IX | 9.72% | 10.73% | (1.01%) |
| American Century One Choice 2050 IX | 10.46% | 11.15% | (0.69%) |
| American Century One Choice 2055 IX | 10.88% | 11.16% | (0.28%) |
| American Century One Choice 2060 IX | 11.15% | 11.40% | (0.25%) |

**Cumulative Calculations:**

| American Century TDF | American Century Cumulative Performance 1/1/2019 to 12/31/2024 | "S&P Target Date To" Cumulative Performance 1/1/2019 to 12/31/2024 | American Century Cumulative Underperformance 1/1/2019 to 12/31/2014 |
|---|---|---|---|
| American Century One Choice 2030 IX | 56.76% | 59.28% | (2.51%) |
| American Century One Choice 2035 IX | 62.07% | 69.48% | (7.41%) |
| American Century One Choice 2040 IX | 67.76% | 77.74% | (9.98%) |
| American Century One Choice 2045 IX | 74.44% | 84.28% | (9.84%) |
| American Century One Choice 2050 IX | 81.64% | 88.60% | (6.96%) |
| American Century One Choice 2055 IX | 85.80% | 88.61% | (2.82%) |
| American Century One Choice 2060 IX | 88.57% | 91.15% | (2.58%) |

85. The duty of prudence is judged by the information available at the time of each investment decision, not in hindsight.

86. As early as the end of 2018, it should have been clear to the Plan Committee that the American Century TDFs in the Elanco Plan were substantially underperforming both their peer group and index on three-year return basis going back to December 31, 2015:

**3-Year Return comparison to "S&P Target Date To" Index:**

| American Century TDF | 2018 American Century 3-Year Return | 2018 "S&P Target Date To" 3-Year Return | 2018 3-Year American Century Underperformance |
|---|---|---|---|
| American Century One Choice 2030 IX | 4.84% | 5.40% | (0.57%) |
| American Century One Choice 2035 IX | 5.09% | 5.62% | (0.53%) |
| American Century One Choice 2040 IX | 5.46% | 6.01% | (0.55%) |
| American Century One Choice 2045 IX | 5.81% | 6.22% | (0.40%) |
| American Century One Choice 2050 IX | 6.02% | 6.41% | (0.39%) |
| American Century One Choice 2055 IX | 6.16% | 6.55% | (0.39%) |
| American Century One Choice 2060 IX | 6.15% | 6.76% | (0.61%) |

87. In addition to the substantial underperformance of the American Century TDFs, there was also other substantial evidence that the American Century TDFs were no longer a suitable investment or QDIA for the Elanco Plan.

88. For instance, the market had taken note of the American Century TDFs' underperformance. In 2016, the American Century TDFs had a roughly 1.5% market share among TDFs. By the end of 2024, that market share had dwindled to 0.5%, or roughly 1/3 of its 2016 market share.




89. While the TDF industry as a whole has seen nearly 100% growth (excluding investment returns), American Century TDFs have seen a nearly 40% decline in assets as a result of redemptions during the same period.

90. Even combining the flow of both Mutual Fund and Trust assets into and out of the American Century TDFs during the Class Period should have caused significant concern for Elanco Plan fiduciaries at the beginning and throughout the Class Period:

**American Century Fund Level Flows (Mutual Funds and Trusts)**

| Name | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| American Century One Choice 2030 | ($198,421,329) | ($5,700,921) | ($253,980,011) | $37,315,280 | ($251,592,021) | ($162,186,796) | ($836,659,311) |
| American Century One Choice 2035 | ($180,466,382) | ($83,649,080) | ($180,772,452) | $61,538,782 | ($159,645,558) | ($145,908,657) | ($638,472,135) |
| American Century One Choice 2040 | ($113,033,458) | $29,113,025 | ($102,940,576) | $86,438,579 | ($156,759,492) | ($56,509,279) | ($577,024,981) |
| American Century One Choice 2045 | ($58,868,860) | ($17,898,926) | ($53,040,712) | $92,937,179 | ($135,011,870) | ($30,887,931) | ($519,419,906) |
| American Century One Choice 2050 | $31,305,806 | $117,539,583 | $1,140,520 | $173,507,812 | ($69,285,296) | $48,148,555 | ($419,104,049) |
| American Century One Choice 2055 | $106,304,055 | $113,226,755 | $75,152,152 | $141,497,095 | $38,563,552 | $135,165,039 | ($320,337,030) |
| American Century One Choice 2060 | $74,822,723 | $108,728,601 | $111,303,921 | $168,575,000 | $91,136,589 | $148,591,990 | ($39,077,950) |
| American Century One Choice 2065 | $0 | $0 | $955,085 | $27,622,723 | $51,629,272 | $73,025,039 | $59,887,744 |
| American Century One Choice In Ret | ($353,712,175) | ($216,150,643) | $380,741,051 | ($407,233,605) | ($552,985,606) | ($338,643,373) | ($683,421,962) |
| **Total** | **($692,069,619)** | **$45,208,394** | **($21,441,023)** | **$382,198,845** | **($1,143,950,431)** | **($329,205,412)** | **($3,973,629,580)** |

91. Additionally, a prudent fiduciary would have monitored the American Century TDFs' underlying investments turnover rate, investigated the reasons for the high turnover rate,

and taken action to protect the Plan participants' retirement savings, including removing the American Century TDFs from the Plan.

92. High turnover rates create meaningful transaction costs for funds.

93. Turnover rates measure how often a fund changes its investments, with higher rates meaning the fund frequently buys and sells stocks or bonds.

94. A higher-than-average turnover rate indicates an investment manager's lack of experience or an attempt to mask a fund's underperformance.

95. "High turnover is worrisome because it can suggest a manager is not following a disciplined investment strategy — which would contradict the funds' role in investors' retirement portfolios." Jessica Toonkel, *Target date turnover troubles big firms*, Investment News (Aug. 29, 2010).

96. A turnover rate above 30% "warrants closer inspection" by investment professionals. *Id.*

97. The American Century TDFs had significant turnover op much higher than 30%, both before and during the Class Period.

98. During the period of 2016-2018, the funds underlying the American Century TDFs had an average turnover of 68% per year, which rose to 72% per year over 2019-2023, substantially higher than the turnover for peer TDFs.

99. A prudent fiduciary would monitor a fund's turnover rate and would understand that excessive turnover can mean that the manager is attempting to remedy underperformance by deviating from the fund's investment strategy.

100. The American Century TDF's turnover was should have been significant red flag to the Plan Committee, and a prudent fiduciary would have investigated the reasons for the high turnover and the impact the turnover was having on the Plan and the participants' retirement savings.

101. Taken together, because of the consistent underperformance, high turnover rates, and loss of market share, Defendants were or should have been aware from the beginning of the

Class Period that the American Century TDFs were no longer a suitable investment for the Elanco Plan, and especially not as the Plan QDIA in which large numbers of employees were invested.

102. The analysis set forth above in ***no way uses hindsight,*** but is based on information that the Plan Committee had or should have had available to them at all times before and during the Class Period.

103. As a result of numerous defects in their fiduciary process, the Plan Committee only removed the American Century TDFs from the Plan on August 18, 2025, many years after they should have.

104. A prudent fiduciary who reviewed that performance, turnover and market share information—all of which was available to Defendants prior to and at the beginning of the Class Period—would have taken action to monitor and remove the American Century TDFs from the Plan as a result of their dramatic and sustained underperformance prior to the beginning of the Class Period.

105. Defendants' failure to monitor or remove the American Century TDFs as investment options for the Plans despite the long-term underperformance, high turnover, and loss of market share suggests that Defendants' fiduciary process was imprudent.

106. These same factors establish that Shepherd, investment advisor to the Elanco Plan, unreasonably favored retention of the American Century TDFs, even when prudent fiduciaries in similar circumstances would have advised their removal from the Plan.

107. No reasonably prudent fiduciary would have allowed so much of the Plan participants' retirement savings, as much as 73%, to be diverted into manifestly imprudent investment options as the American Century TDFs.

108. As relevant here, American Century Target Date Series were the only target date investing option in the Plan from January 1, 2019 to August 17, 2025, when they were finally replaced by the TRP TDFs. In other words, for most of the Class Period, participants in the Plan who wanted to invest in a target date strategy had no choice but the American Century TDFs.

109. Both Shepherd and the Plan Committee ignored issues with the American Century TDFs and did not conduct effective TDF suitability analyses or comparative TDF analyses during the Class Period.

110. A prudent plan fiduciary would have replaced these American Century TDFs substantially earlier, especially since according to the April 2022 IPSs that "monitoring performance relative to specified guidelines is part of the overall monitoring process," and that, "[m]onitoring should be regularly and follow the same criteria used for the initial selection of investments. It is contemplated . . . that a formal review will be done at least annually."

111. For TDFs, according to the April 2022 IPS, this means that in addition to the sixteen investment criteria in Appendix A, the Plan Committee can "select, retain, or replace asset allocation funds based upon plan participant demographics, salary levels, typical saving rates, participant investment education levels, post-retirement distribution pattern and risk/return tolerances." April 2022 IPS, Appx. A.

112. Had Shepherd applied the appropriate scoring methodology for the American Century Funds, there would have been red flags for the Plan Committee that they needed to replace the American Century TDFs at the beginning of the Class Period.

113. The Plan Committee was responsible for crafting the Plan lineup and could have chosen other target date families than the American Century TDFs at the beginning of the Class Period in October 2019. Assuming similar investment criteria existed in the Plan IPS prior to April 2022, then the evaluation of the American Century TDFs would have also failed to meet the appropriate prudent criteria.

114. The Plan Committee was responsible for following the evaluation criteria and methodology set out in the April 2022 Plan IPSs, but failed to do so.

115. In other words, the Plan Committee deviated from the guidelines concerning the selection, evaluation, and monitoring of Plan investment options in the April 2022 Plan IPS.

116. As a result of numerous procedural defects in their fiduciary process, the Plan Committee did not remove the American Century TDFs from the Plan until August 18, 2025,

almost six years later than they should have had if the Plan Committee had followed their Plan IPS and its investment criteria.

117. The Plan Committee engaged in at least four major Plan fiduciary process errors during the Class Period that deviated from guidelines concerning the selection, evaluation, and monitoring of Plan investment options in the April 2022 Plan IPS:

a. uncritically relied on the Plan investment advisor and consultant, Shepherd, who unreasonably and imprudently favored American Century TDFs to be Plan investments and qualified default investment alternatives ("QDIAs") from the beginning of the Class Period until August 17, 2025;

b. failed to follow the Plan's investment policy statement ("IPS") and Plan Committee practice which required Plan funds scoring less than 65 to be placed on a Watch List;

c. failed to undertake timely TDF or QDIA suitability analyses with regard to the American Century TDFs during the Class Period; and

d. waited too long to replace the American Century TDFs given that knew of its consistent underperformance, high investment turnover rate, and loss of TDF market share, during the entire Class Period.

118. Through at least these four major fiduciary process defects, which amount to both objectively unreasonable and imprudent conduct, Defendants breached their fiduciary duties of prudence by retaining and not removing the American Century TDFs from January 2019 until August 2025.

119. Prudent alternative TDF options existed for the American Century TDFs – "meaningful benchmarks" that were more suitable in terms of asset class coverage, glide paths, performance and category ranking, various performance metrics, risk v. return, net expense ratio, fund structure, underlying funds, and glidepath changes, all criterion outlined in the Plan's April 2022 Plan IPS.

120. During the Class Period, Plaintiffs had no knowledge of Defendants' process for selecting TDFs and for regularly monitoring them to ensure they remained prudent.

121. During the Class Period, Plaintiffs had no knowledge of how the performance of the TDFs compared to readily available prudent alternative investments and whether the American Century TDFs remained suitable given Plan demographics and other Plan features.

122. During the Class Period, Plaintiffs did not know about the availability of comparable investment options that Defendants failed to reasonably offer at the beginning of the Class Period in October 2019, because Defendants provided no suitability or comparative TDF information to allow Plaintiffs to evaluate and compare Defendants' potential TDF options.

## OBJECTIVE IMPRUDENCE OF INVESTMENT DECISION

123. In addition to all this and other direct evidence of procedural defects, the American Century TDFs constituted an objectively imprudent investment decision for the Elanco Plan, especially given that large amounts being invested by Plan participants because it was the Plan QDIA for most of the Class Period.

124. For several years prior to the Class Period, and continuing throughout the class period, the American Century TDFs have consistently underperformed other prudent target date series options as well as other common benchmarks.

125. Defendants were imprudent starting in October 2019 in retaining the American Century TDFs, and should have known from the information presented by Shepherd about the American Century TDFs' lack of suitability for the Plan demographics, its imprudent structure and plan design, and its poor, historical investment performance adjusted for risk.

126. The standard of care for prudent retirement plan fiduciaries would have been to evaluate the performance of the American Century TDFs against other alternatives and commonly used benchmarks such as the "S&P Target Date To" benchmark or alternative Peer Group funds when selecting, monitoring, and retaining or removing, the American Century TDFs.

127. For the type of TDFs in the Elanco Plan during the relevant time period, the American Century TDFs, there are seven vintages (2030 through 2060) over seven years (2018 to 2024).

128. Out of 48 scorecards under the April 2022 Plan IPS (48 instead of 49 because the 2060 vintage started in late 2018), based on the investment criteria in the April 2022 IPS, Appendix A, for Target Date funds, there are 36 Scorecards where the American Century funds did not achieve 65 points for a passing score, and therefore should have been placed on the "Watch List." See April 2022 IPS at 8 and Appx. A ("A total score of less than 65 points indicates the investment option has not met a preponderance of the investment monitoring criteria.").

129. The charts below illustrates that when evaluated against the sixteen investment evaluation metrics in Appendix A of the Elanco Plan's April 2022 IPS, the following three vintages of the American Century TDFs consistently failed to passed (with a score of 65 or more) starting in 2018 and continuing through 2024 (with the exception of 2022, and then only barely):

**Elanco Investment Criteria Scores (IPS Appendix A - Target Date Funds)**

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| American Century One Choice 2035 IX | 20 | 58 | 63 | 58 | 72 | 32 | 14 |
| American Century One Choice 2040 IX | 14 | 58 | 63 | 58 | 72 | 22 | 14 |
| American Century One Choice 2045 IX | 40 | 58 | 72 | 58 | 67 | 22 | 14 |

130. As discussed above, diligent investment professionals monitor the performance and other relevant factors of their selected target date funds using appropriate industry-recognized metrics set out in their Plan's IPS. Given the consistent failing scores above, the Plan Committee could not have engaged in a prudent process, and that imprudent process led the Plan Committee to invest for over six years in objectively imprudent funds that cause Plan participants and beneficiaries to lose tens of millions of dollars.

131. Other prudent investments with a "to" glide path and active management were available to the Plan during the same period in the same Peer Group, including the MFS Lifetime

TDFs, which would have received all passing scores under the sixteen investment metrics in the Elanco Plan IPS:

**Elanco Investment Criteria Scores (IPS Appendix A - Target Date Funds)**

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| MFS Lifetime 2035 R6 | 72 | 72 | 82 | 84 | 82 | 84 | 82 |
| MFS Lifetime 2040 R6 | 72 | 72 | 82 | 72 | 84 | 86 | 88 |
| MFS Lifetime 2045 R6 | 88 | 76 | 86 | 78 | 88 | 88 | 80 |

132. The following chart uses criteria from the Plan's April 2022 IPS to show how often American Century TDFs underperformed comparable MFS TDFs during the relevant period:

**American Century Target Date Series vs MFS Lifetime Series -**
**Percentage of Metrics AC Underperformed**

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | Total 2020-2024 |
|---|---|---|---|---|---|---|---|---|
| Total Return - 3 Year | 100% | 100% | 29% | 100% | 100% | 100% | 100% | **86%** |
| Total Return - 5 Year | | 100% | 83% | 100% | 100% | 100% | 100% | **97%** |
| Alpha - 3 Year | 100% | 100% | 0% | 0% | 100% | 100% | 100% | **60%** |
| Alpha - 5 Year | | 100% | 17% | 29% | 100% | 100% | 100% | **71%** |
| Beta - 3 Year | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **0%** |
| Beta - 5 Year | | 0% | 0% | 0% | 0% | 0% | 0% | **0%** |
| Treynor Ratio - 3 Year | 100% | 100% | 0% | 0% | 100% | 100% | 100% | **60%** |
| Treynor Ratio - 5 Year | | 100% | 17% | 14% | 100% | 100% | 100% | **68%** |
| Sortino Ratio - 3 Year | 100% | 100% | 0% | 0% | 100% | 100% | 100% | **60%** |
| Sortino Ratio - 5 Year | | 100% | 0% | 0% | 100% | 100% | 100% | **62%** |
| Manager Tenure | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **0%** |
| Net Expense Ratio | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **0%** |
| Up-Market Capture - 3 Year | 100% | 100% | 86% | 100% | 100% | 100% | 100% | **97%** |
| Up-Market Capture - 5 Year | | 86% | 86% | 100% | 100% | 100% | 100% | **97%** |
| Down-Market Capture - 3 Year | 83% | 71% | 100% | 100% | 100% | 100% | 86% | **97%** |
| Down-Market Capture - 5 Year | | 83% | 100% | 100% | 100% | 100% | 100% | **100%** |

133. No "circuit court … has held that a market index can never serve as a meaningful benchmark." *Johnson v. Parker-Hannifin Corp.*, 122 F.4th 205, 218 (6th Cir. 2024).

134. The American Century TDFs also underperformed the most relevant market benchmark, the S&P Target Date "To" index, before and during the Class Period.

135. For instance, for the three-year period from December 31, 2015 to December 31, 2018, the American Century TDFs underperformed the S&P TDF "To" Benchmark:

| American Century TDF | 2018 American Century 3-Year Return | 2018 "S&P Target Date To" 3-Year Return | 2018 3-Year American Century Underperformance |
|---|---|---|---|
| American Century One Choice 2030 IX | 4.84% | 5.40% | (0.57%) |
| American Century One Choice 2035 IX | 5.09% | 5.62% | (0.53%) |
| American Century One Choice 2040 IX | 5.46% | 6.01% | (0.55%) |
| American Century One Choice 2045 IX | 5.81% | 6.22% | (0.40%) |
| American Century One Choice 2050 IX | 6.02% | 6.41% | (0.39%) |
| American Century One Choice 2055 IX | 6.16% | 6.55% | (0.39%) |
| American Century One Choice 2060 IX | 6.15% | 6.76% | (0.61%) |

136. The same pattern of underperformance for the American Century TDFs continued after January 1, 2019:

**Annualized Calculations:**

| American Century TDF | American Century Annualized Performance 1/1/2019 to 12/31/2024 | "S&P Target Date To" Annualized Performance 1/1/2019 to 12/31/2024 | American Century Annualized Underperformance 1/1/2019 to 12/31/2014 |
|---|---|---|---|
| American Century One Choice 2030 IX | 7.78% | 8.07% | (0.29%) |
| American Century One Choice 2035 IX | 8.38% | 9.19% | (0.81%) |
| American Century One Choice 2040 IX | 9.01% | 10.06% | (1.05%) |
| American Century One Choice 2045 IX | 9.72% | 10.73% | (1.01%) |
| American Century One Choice 2050 IX | 10.46% | 11.15% | (0.69%) |
| American Century One Choice 2055 IX | 10.88% | 11.16% | (0.28%) |
| American Century One Choice 2060 IX | 11.15% | 11.40% | (0.25%) |

**Cumulative Calculations:**

| American Century TDF | American Century Cumulative Performance 1/1/2019 to 12/31/2024 | "S&P Target Date To" Cumulative Performance 1/1/2019 to 12/31/2024 | American Century Cumulative Underperformance 1/1/2019 to 12/31/2014 |
|---|---|---|---|
| American Century One Choice 2030 IX | 56.76% | 59.28% | (2.51%) |
| American Century One Choice 2035 IX | 62.07% | 69.48% | (7.41%) |
| American Century One Choice 2040 IX | 67.76% | 77.74% | (9.98%) |
| American Century One Choice 2045 IX | 74.44% | 84.28% | (9.84%) |

| | | | |
|---|---|---|---|
| American Century One Choice 2050 IX | 81.64% | 88.60% | (6.96%) |
| American Century One Choice 2055 IX | 85.80% | 88.61% | (2.82%) |
| American Century One Choice 2060 IX | 88.57% | 91.15% | (2.58%) |

137. Moreover, the underperformance of the American Century TDFs became even more severe after 2020:

**01/1/2021 to 12/31/2024 - Return comparison to "S&P Target Date To" Index:**

**Annualized Calculations:**

| American Century TDF | American Century Annualized Performance 1/1/2021 to 12/31/2024 | "S&P Target Date To" Annualized Performance 1/1/2021 to 12/31/2024 | American Century Annualized Underperformance 1/1/2021 to 12/31/2014 |
|---|---|---|---|
| American Century One Choice 2030 IX | 3.82% | 4.71% | (0.89%) |
| American Century One Choice 2035 IX | 4.11% | 5.73% | (1.62%) |
| American Century One Choice 2040 IX | 4.42% | 6.65% | (2.23%) |
| American Century One Choice 2045 IX | 4.83% | 7.39% | (2.56%) |
| American Century One Choice 2050 IX | 5.34% | 7.79% | (2.44%) |
| American Century One Choice 2055 IX | 5.75% | 7.83% | (2.07%) |
| American Century One Choice 2060 IX | 5.95% | 7.91% | (1.96%) |

**Cumulative Calculations:**

| American Century TDF | American Century Cumulative Performance 1/1/2021 to 12/31/2024 | "S&P Target Date To" Cumulative Performance 1/1/2021 to 12/31/2024 | American Century Cumulative Underperformance 1/1/2021 to 12/31/2014 |
|---|---|---|---|
| American Century One Choice 2030 IX | 16.17% | 20.20% | (4.02%) |
| American Century One Choice 2035 IX | 17.49% | 24.96% | (7.47%) |
| American Century One Choice 2040 IX | 18.88% | 29.38% | (10.50%) |
| American Century One Choice 2045 IX | 20.79% | 33.01% | (12.22%) |
| American Century One Choice 2050 IX | 23.16% | 34.98% | (11.82%) |
| American Century One Choice 2055 IX | 25.08% | 35.17% | (10.09%) |
| American Century One Choice 2060 IX | 26.03% | 35.60% | (9.57%) |

138. Prudent fiduciaries would have acknowledged that this pattern of underperformance prior to the Class Period did not bode well for American Century TDFs' future performance and would have made a timely switch to any of the numerous safer, better managed, investment options in the same Peer Group.

139. Given the long history of underperformance, it is inexplicable why the American Century TDFs would have been included as Plan investment options by the start of the Class Period and kept in place, unless Shepherd was unreasonably favoring American Century TDFs for retention or Elanco was ignoring Shepherd's investment advice, either of which would be a fiduciary breach.

## **LOSS CAUSATION**

140. By failing to engage in an objectively reasonable fiduciary process when retaining and failing to remove American Century TDFs from October 2019 until August 2025, Defendants breached their fiduciary duties of prudence to Plaintiffs and Plan participants and are liable to Plaintiffs and Class Members for the retirement monies lost through the imprudent investment in the American Century TDFs through most of the Class Period.

141. If the Plan Committee appropriately evaluated the American Century TDFs at the beginning of and throughout the Class Period, it should have selected a more suitable and prudent TDF suite in their Peer Group. Any of those Peer Group suites of TDFs would have delivered performance superior to that of the American Century TDFs.

142. The imprudent fiduciary procedure followed by the Plan Committee led to the retention of the objectively imprudent American Century TDFs funds until August 18, 2025, instead of timely replacing these funds with various reasonable alternative prudence investments which were available during the entire Class Period.

143. Although not the only possible replacement TDF series, one possible comparator TDF series in the Peer Group with a similar end glide path and investment philosophy was the MFS LifeTime TDFs.

144. Additionally, the American Century TDFs can be compared against the S&P TDF "To" Index, the most specific market benchmark for the American Century TDFs.

145. The following chart illustrates an estimate of damages suffered for each vintage of the American Century TDFs by maintaining the American Century TDF as the Plan's default investment instead of selecting, at the beginning of the Class Period, a more suitable and prudent alternative suite of TDFs, such as the MFS Lifetime TDFs or as compared to the S&P Target To Index:

**January 1, 2020 to December 31, 2024 – AC 2030 Performance vs. Comparable Funds/Benchmarks**

| Fund | Cumulative Return | Annualized Return | Growth of $66,062,003 | Difference |
|---|---|---|---|---|
| **American Century One Choice 2030 IX** | **31.72%** | **5.66%** | **$87,015,695** | **$0** |
| MFS Lifetime 2030 R6 | 33.42% | 5.94% | $88,142,489 | -$1,126,794 |
| S&P Target Date To 2030 TR | 34.32% | 6.08% | $88,734,106 | -$1,718,412 |

**January 1, 2020 to December 31, 2024 – AC 2035 Performance vs. Comparable Funds/Benchmarks**

| Fund | Cumulative Return | Annualized Return | Growth of $57,155,296 | Difference |
|---|---|---|---|---|
| **American Century One Choice 2035 IX** | **34.59%** | **6.12%** | **$76,925,026** | **$0** |
| MFS Lifetime 2035 R6 | 44.11% | 7.58% | $82,367,523 | -$5,442,497 |
| S&P Target Date To 2035 TR | 40.54% | 7.04% | $80,328,298 | -$3,403,272 |

**January 1, 2020 to December 31, 2024 – AC 2040 Performance vs. Comparable Funds/Benchmarks**

| Fund | Cumulative Return | Annualized Return | Growth of $51,781,675 | Difference |
|---|---|---|---|---|
| **American Century One Choice 2040 IX** | **37.77%** | **6.62%** | **$71,340,652** | **$0** |
| MFS Lifetime 2040 R6 | 49.95% | 8.44% | $77,648,202 | -$6,307,550 |
| S&P Target Date To 2040 TR | 45.58% | 7.80% | $75,381,301 | -$4,040,649 |

**January 1, 2020 to December 31, 2024 – AC 2045 Performance vs. Comparable Funds/Benchmarks**

| Fund | Cumulative Return | Annualized Return | Growth of $32,960,207 | Difference |
|---|---|---|---|---|
| **American Century One Choice 2045 IX** | **41.55%** | **7.20%** | **$46,656,726** | **$0** |
| MFS Lifetime 2045 R6 | 52.67% | 8.83% | $50,320,678 | -$3,663,952 |
| S&P Target Date To 2045 TR | 49.74% | 8.41% | $49,354,160 | -$2,697,434 |

January 1, 2020 to December 31, 2024 – AC 2050 Performance vs. Comparable Funds/Benchmarks

| Fund | Cumulative Return | Annualized Return | Growth of $20,665,873 | Difference |
|---|---|---|---|---|
| American Century One Choice 2050 IX | 45.79% | 7.83% | $30,129,658 | $0 |
| MFS Lifetime 2050 R6 | 53.33% | 8.92% | $31,687,543 | -$1,557,885 |
| S&P Target Date To 2050 TR | 52.79% | 8.85% | $31,575,859 | -$1,446,202 |

January 1, 2020 to December 31, 2024 – AC 2055 Performance vs. Comparable Funds/Benchmarks

| Fund | Cumulative Return | Annualized Return | Growth of $9,202,961 | Difference |
|---|---|---|---|---|
| American Century One Choice 2055 IX | 48.52% | 8.23% | $13,668,166 | $0 |
| MFS Lifetime 2055 R6 | 53.38% | 8.93% | $14,115,116 | -$446,950 |
| S&P Target Date To 2055 TR | 52.60% | 8.82% | $14,043,831 | -$375,665 |

January 1, 2020 to December 31, 2024 – AC 2060 Performance vs. Comparable Funds/Benchmarks

| Fund | Cumulative Return | Annualized Return | Growth of $3,211,265 | Difference |
|---|---|---|---|---|
| American Century One Choice 2060 IX | 50.14% | 8.47% | $4,821,468 | $0 |
| MFS Lifetime 2060 R6 | 53.41% | 8.94% | $4,926,478 | -$105,010 |
| S&P Target Date To 2060 TR USD | 54.11% | 9.04% | $4,948,910 | -$127,442 |

146. In total, Plaintiffs and Class members suffered losses of approximately $13,809,076 to $18,650,638 in investment losses between January 1, 2020 and December 31, 2024:

**American Century Losses January 2020 - December 2024**

| Target Date Series Name | AC's Performance Losses ($) vs. Comparators |
|---|---|
| MFS Lifetime Series | -$18,650,638 |
| S&P Target Date To | -$13,809,076 |

147. Because the S&P Target "To" Index was not itself an available investment option, but only used for comparison purposes, Defendants caused objectively unreasonable losses to Plaintiffs and the Plan's participants of more than $18 million from the beginning of the Class Period, when considering the retirement losses suffered by Plaintiffs and the Class by the Plan Committee maintaining the American Century TDFs as the Plan's QDIA through August 17, 2025.

148. Under the objective prudent person standard, courts in this Circuit examine both the process used by the fiduciaries to reach their decision as well as an evaluation of the merits. Considering both the substantive reasonableness of Defendants' actions and the prudence by which the fiduciary made its decision, Defendants, as fiduciaries, breached their fiduciary duty by selecting and retaining the American Century TDFs in the Elanco Plan for most of the Class Period, causing tens of millions of dollars of investment losses to Plaintiffs and other Class Members during the Class Period.

## CLASS ACTION ALLEGATIONS

149. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

150. In acting in this representative capacity, Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following Class:

> All participants and beneficiaries of the Elanco, Inc. 401(k) Plan who invested in any of the American Century Target Date Funds (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) during the Class Period.

151. The Class Period is defined as six years prior to the filing of this Complaint and continuing through the date of judgment in this action.

152. The Class includes thousands of members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

153. There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owe fiduciary duties to the Plan and took the actions and omissions alleged as to the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

- Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

- Whether Defendants breached their fiduciary duties to the Plan;
- What are the losses to the Plan resulting from each breach of fiduciary duty; and
- What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

154. Plaintiffs' claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiffs were Plan participants during the time period at issue and the designated participants in the Plan were harmed by Defendants' fiduciary misconduct in the same manner.

155. Plaintiffs will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because they were Plan participants in the Plan during the Class period, have no interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent lawyers to represent the Class.

156. Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

157. Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

158. Plaintiffs' attorneys are experienced in complex ERISA and class litigation and will adequately represent the Class.

159. The claims brought by the Plaintiffs arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts. The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in the Plan. Exhaustion is intended to serve as a Plan procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

160. Under ERISA, an individual "participant" or "beneficiary" are distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust Plan remedies – does not, by itself, bind the Plan.

## FIRST CLAIM FOR RELIEF
**Breach of Duty of Prudence of ERISA, as Amended**
**(Plaintiffs, on behalf of themselves and Class,**
**Against Defendant Plan Committee and Shepherd– Challenged TDFs)**

161. Plaintiffs restate the above allegations as if fully set forth herein.

162. Defendant Plan Committee and its members and Shepherd are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

163. 29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendant Plan Committee and Shepherd in managing the investments of the Plan.

164. Defendant Plan Committee and Shepherd, as fiduciaries of the Plan, are responsible for selecting and maintaining prudent investment options and taking any other necessary steps to ensure that the Plan's assets are invested prudently.

165. During the Class Period, Defendant Plan Committee had fiduciary duty to do all of the following: manage the assets of the Plan prudently and act with the care, skill, diligence, and prudence required by ERISA.

166. During the Class Period, Defendant Shepherd had fiduciary duty to provide investment advice to the Plan, with the care, skill, diligence, and prudence required by ERISA.

167. During the Class Period, Defendant Plan Committee and Shepherd breached their fiduciary duties of prudence owed to Plan participants, including to Plaintiffs, by failing to manage and administer the American Century TDFs of the Plan prudently, and failing to act with the care, skill, diligence, and prudence required by ERISA.

168. Defendant Plan Committee and Shepherd, as fiduciaries of the Plan, had a continuing duty to regularly monitor and independently assess before and during the Class Period whether the Plan's TDFs were prudent choices for the Plan and to remove substantively imprudent investment options regardless of how long those investments had been in the Plan.

169. During the Class Period, Defendant Plan Committee and Shepherd breached their fiduciary duties of prudence to Plan participants, including Plaintiffs, by failing to engage in a prudent fiduciary process for monitoring the Plan's TDFs which led to the removal of the substantively imprudent American Century TDFs within a reasonable period.

170. Defendant Plan Committee was directly responsible for: evaluating and monitoring the Plan's investment options, including the American Century TDFs, in a prudent fashion; eliminating funds, such the American Century TDFs, that were no longer prudent investment options; and taking all necessary steps to ensure that the Plan's assets were invested prudently and appropriately.

171. Defendant Shepherd was directly responsible for evaluating and monitoring the Plan's investment options, including the American Century TDFs, in a prudent fashion.

172. Defendant Plan Committee and Shepherd failed to employ a prudent fiduciary process by failing to monitor and evaluate the American Century TDFs for suitability given Plan demographics and in comparison to other meaningful benchmark TDFs and indices, which led to the substantively imprudent decision to maintain the American Century TDFs in the Plan for most of the Class Period, through August 18, 2025.

173. Defendant Plan Committee and Shepherd, as fiduciaries of the Plan, had a continuing duty to regularly monitor and independently assess through the Plan April 2022 IPS whether the Plan's American Century TDFs were prudent choices for the Plan and the Plan

Committee should have removed this substantively imprudent investment options at the beginning of the Class Period based on underperformance, turnover rates, and loss of marker share.

174. Defendant Plan Committee and Shepherd failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their fiduciary duties of prudence under 29 U.S.C. § 1104(a)(1)(B).

175. As a result of Defendant Plan Committee and Shepherd's breach of their fiduciary duty of prudence with respect to the Elanco Plan, the Plaintiffs and Plan participants suffered tens of millions of dollars in unreasonable and unnecessary investment losses.

176. Defendant Plan Committee and Shepherd are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Elanco Plan the losses resulting from their fiduciary breaches, to restore to the Plan any profits they made through the use of Plan assets, and to restore to the Plan any profits resulting from the breach of fiduciary duty alleged in this Count. In addition, Defendants Plan Committee and Shepherd are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries under ERISA,**
**(Plaintiffs, on behalf of themselves and Class,**
**Against Defendants Elanco and Board – Challenged TDFs)**

177. Plaintiffs restate the above allegations as if fully set forth herein.

178. Defendants Elanco and Board had the authority to appoint and remove members or individuals responsible for Plan investment management on the Plan Committee and for hiring Shepherd, and were aware that these fiduciaries had critical responsibilities for the Plan.

179. In light of this authority, Defendants Elanco and Board had a duty to monitor those individuals responsible for Plan investment management on the Plan Committee and at Shepherd to ensure that they were adequately performing their fiduciary obligations, and to take prompt

and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

180. Defendants Elanco and Board had a duty to ensure that the individuals responsible for Plan investment management on the Plan Committee and at Shepherd possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants Elanco and Board.

181. Defendants Elanco and Board breached their duty to monitor individuals responsible for Plan investment management on the Plan Committee and at Shepherd, by, among other things:

- Failing to monitor and evaluate the performance of individuals responsible for Plan investment management on the Plan Committee or at Shepherd or have a system in place for doing so, standing idly by as the Plan suffered significant losses by maintaining the imprudent American Century TDFs for most of the Class Period;
- Failing to monitor the process by which Plan TDFs were evaluated, failing to investigate the suitability of the American Century TDFs based on Plan demographics and failing to investigate the availability of alternative, prudent TDFs; and
- Failing to remove individuals responsible for Plan investment management on the Plan Committee or Shepherd whose performance was inadequate in that they continued to maintain the American Century TDFs, all to the detriment of the Plan and Plan participants' retirement savings.

182. As a result of Defendants Elanco and Board's foregoing breaches of the duty to monitor, the Plaintiffs and Plan Participants suffered unreasonable and unnecessary monetary losses amounting to tens of millions of dollars.

183. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants Elanco and Board are liable to restore to the Plan all loses caused by their failure to adequately monitor individuals responsible for Plan investment management on the Plan Committee and at Shepherd. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C. A Declaration the Defendants have breached their fiduciary duties of prudence and to monitor under ERISA;

D. Order compelling Defendants to make good to Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from imprudent investment of the Plan's assets in the American Century TDFs, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Plan participants would have made if the Defendants had fulfilled their fiduciary obligations by undertaking TDF suitability and comparative analyses on a timely basis;

E. Order requiring Defendants to disgorge all profits received from, or in respect of, Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of accounting for profits, imposition of constructive trust, or surcharge against Defendants as necessary to effectuate relief, and to prevent unjust enrichment;

F. An award of pre-judgment interest;

G. An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

H. Such other and further relief as the Court deems equitable and just.

DATED: October 21, 2025

Respectfully submitted,

*/s/ Paul M. Secunda*
Paul M. Secunda
**WALCHESKE & LUZI, LLC**
235 N. Executive Drive, Suite 240
Brookfield, Wisconsin 53005
Telephone: (414) 828-2372
psecunda@walcheskeluzi.com

*Attorneys for Plaintiffs and Proposed Class*